# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| JEFFREY S. PATTERSON,<br><br>         Plaintiff,<br><br> v.<br><br>STATE OF NEVADA, ex. rel.<br>NEVADA DEPARTMENT OF<br>CORRECTIONS, et. al.,<br><br>         Defendants. | 3:11-cv-00845-HDM-WGC<br><br>**REPORT & RECOMMENDATION OF**<br>**U.S. MAGISTRATE JUDGE** |

This Report and Recommendation is made to the Honorable Howard D. McKibben, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Plaintiff's Motion for Summary Judgment. (Doc. # 99.)[1] Defendant Chester Patterson filed a response (Doc. # 100) and Plaintiff filed a reply (Doc. # 105). Also before the court is defendant Patterson's Motion for Summary Judgment. (Doc. # 101.) Plaintiff filed a response (Doc. # 106) and defendant Patterson filed a reply (Doc. # 109). Plaintiff was permitted to file a sur-reply. (*See* order permitting sur-reply at Doc. # 115, and sur-reply at Doc. # 122.)

After a thorough review, the court recommends that Plaintiff's motion (Doc. # 99) be denied and that defendant Patterson's motion (Doc. # 101) be granted.

## I. BACKGROUND

At all relevant times, Plaintiff was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl., Doc. # 4 at 1; Am. Compl. Doc. # 74.)[2] The events giving

---

[1] Refers to court's docket number. Unless otherwise noted, all page number references are to the court's docketed page numbers. Doc. # 99 is Plaintiff's operative motion for summary judgment. He attempted to file the document at Docs. # 97 and # 98; however, they were both scanned improperly and were missing pages.

[2] The complaint was amended to reflect the addition of the proper defendant, Chester Patterson, only.

1  rise to this litigation took place while Plaintiff was housed at Northern Nevada Correctional
2  Center (NNCC). (*Id*.) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983.
3  (*Id*.) The only remaining defendant is Chester Patterson.[3]

4  Plaintiff alleges that on April 5, 2010, at approximately 5:45 p.m., his unit, 7B, was on
5  lockdown for "count" and during this time there is usually no movement in the unit. (Doc. # 4 at
6  5-6.) He states that he pushed the call button in his cell to ask defendant Correctional Officer
7  Patterson, who was working the control tower, for the correct spelling of an investigator's name,
8  to which Patterson responded: "Do I look like your secretary?" (*Id*.) Plaintiff then replied,
9  jokingly: "No, my secretaries are cuter." (*Id*.) Patterson then stated: "Your secretaries are on
10 [their] way." (*Id*.) Plaintiff then heard a cell door being opened on the tier, and subsequently two
11 inmates he believed to be gang members arrived at Plaintiff's cell door. (*Id*.) Plaintiff alleges the
12 inmates began yelling at Plaintiff and were visible to Patterson in the control tower. (*Id*. at 6.)

13 Plaintiff's cell door was then opened, allowing the inmates to enter, and they began to
14 assault Plaintiff. (*Id*. at 6-7.) He contends that he was bleeding from his left leg, and his right
15 knee was bruised and swollen, and he had bleeding on the left side of his chin. (*Id*. at 7.) The two
16 inmates then exited Plaintiff's cell. (*Id*.) The next thing Plaintiff remembers is being told to get
17 on the floor by another correctional officer. (*Id*.) He contends the extent of his injuries were more
18 visible the next day. (*Id*.) He claims that he told the inquiring officer that everything was fine out
19 of fear of reprisal from the two inmates because he was being questioned in their proximity. (*Id*.)

20 Both parties now move for summary judgment.

## II. LEGAL STANDARD

22 "The purpose of summary judgment is to avoid unnecessary trials when there is no
23 dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18
24 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary
25 judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,

---

Other orders entered with respect to the original complaint apply to the amended complaint. (*See* Doc. # 78.)

[3] Summary judgment was granted as to defendant Columbus. (Report and Recommendation at Doc. # 66; Order adopting at Doc. # 102.) Plaintiff's motion for reconsideration of the order granting summary judgment to defendant Columbus will be addressed separately.

525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

///

## III. DISCUSSION

**A. Argument**

On the date in question, Plaintiff was housed in Unit 7B at NNCC, which is a two-story unit with a staff office on the first floor of the unit and a control bubble on the second floor, above the unit staff office. (Doc. # 99 at 2.) Plaintiff was housed in cell 75, on the upper tier. (*Id.* at 22 ¶ 4.) Plaintiff claims the control bubble has a three hundred and sixty degree view of the inside of the unit and to the outside as the control bubble has twelve windows to the tier. (*Id.* at 2.) According to Plaintiff the control bubble officer has access to a shotgun and the ability to use intercom boxes to listen to what is going on in any cell. (*Id.*) He also contends that officer has the power to open and close doors in the unit. (*Id.*) At the time the incident occurred, it is undisputed defendant Patterson was the control bubble officer. (*Id.* at 22 ¶ 5; Doc. # 101 at 2; Doc. # 101-1 at 2 (Chester Patterson Decl.) ¶¶ 1-2.)

During the day, the cell doors in Unit 7B are open and inmates can come and go; prior to a "count," however, inmates must report to their cells so the officers can account for their presence. (Doc. # 99 at 2.) During this time, Plaintiff contends the cells are on lock down and there is to be no inmate movement. (*Id.*) Inmates who need to leave during this time are either escorted by officers or calls are made to towers to let other officers know where an inmate is going. (*Id.*)

According to defendant Patterson, "count" is the process where correctional officers account for the presence of each inmate. (Doc. # 101 at 2.) In the time leading up to "count," defendant Patterson states that it is not uncommon for inmates to be coming and going from their cells. (*Id.*)

Plaintiff contends that on April 5, 2010, at 5:30 p.m., staff called for the unit to be on lock down in preparation for "count." (*Id.* at 3.) According to defendant Patterson, count was to occur at 6:00 p.m., and shortly before that time, Plaintiff called to the control bubble over the intercom from his cell and asked defendant Patterson for the spelling of the name of an NDOC investigator, and for information on how to contact that investigator. (Doc. # 101 at 2; Doc.

1  # 101-1 at 2 ¶ 3.) Defendant Patterson responded to Plaintiff that he did not have the information
2  and he was "not Plaintiff's secretary." (*Id*.)   Defendant Patterson claims that shortly thereafter,
3  inmates Sullivan and Foster (who ultimately assaulted Plaintiff), called to the control room over
4  the intercom from their cell and stated that they overhead Plaintiff asking for the information
5  regarding the investigator, and indicated they had the information Plaintiff was trying to obtain.
6  (Doc. # 101 at 2; Doc. # 101-1 at 2 ¶ 4.) Defendant Patterson says that Plaintiff then called the
7  control bubble from his intercom stating that he had heard Sullivan and Foster's statement and
8  that he would like to obtain the information from them. (Doc. # 101 at 2; Doc. # 101-1 at 2 ¶ 5.)
9  Defendant Patterson told Plaintiff he should wait until the following day, when the inmates were
10 no longer locked in their cells and the tier was open; however, Plaintiff asked defendant
11 Patterson to allow Sullivan and Foster out of their cells to come to his cell and to open his cell so
12 they could give him the information. (Doc. # 101 at 2-3; Doc. # 101-1 at 2 ¶¶ 6-7.) Defendant
13 Patterson agreed to do so, but told the inmates they needed to hurry and exchange the
14 information before the impending count. (Doc. # 101 at 3; Doc. # 101-1 at 2 ¶ 8.)

15 Defendant Patterson maintains he had no knowledge of any risk of harm to Plaintiff in
16 opening the cell doors. (Doc. # 101 at 3; Doc. # 101-1 at 2 ¶ 9.) When it appeared that an
17 incident was taking place in Plaintiff's cell, officers on the floor were notified and immediately
18 responded. (Doc. # 101 at 3.)

19 Plaintiff, on the other hand, claims that at approximately 5:45 p.m., Plaintiff heard a cell
20 door open, and then two inmates were yelling at him through his cell door. (Doc. # 99 at 22 ¶ 7.)
21 Plaintiff contends that defendant Patterson, as the control bubble officer, is the only person who
22 could have opened their cell doors. (*Id.* ¶ 8.) Plaintiff claims that defendant Patterson
23 subsequently opened Plaintiff's cell door to allow the two inmates into the cell. (*Id*. ¶ 9.) Plaintiff
24 contends that the inmates then began to beat him for several minutes. (Id. at 23 ¶ 11.) He asserts
25 that at 5:50 p.m., correctional officers responded to the altercation in his cell. (*Id*. at 3.) Plaintiff
26 references that Officer Columbus, who was in the staff unit before count began, was notified of
27 the altercation in Plaintiff's cell by defendant Patterson in the control bubble, and went to
28 Plaintiff's cell and instructed him to "assume the prone position" and applied wrist restraints.

1   (*Id*.) Other officers had restrained the two inmates that had attacked Plaintiff. (*Id*.)

2   Plaintiff concedes that the investigative report detailing the incident states that Plaintiff
3   told the investigating officer "nothing happened," but Plaintiff contends that when he made that
4   statement he was scared for his life as he was only a few feet from his assailants. (*Id*. at 3, 10.)
5   He did not want to be known as a snitch to other inmates or accuse the assailants in their
6   presence. (*Id*. at 3.) Plaintiff also points out that the medical report completed after the incident
7   indicates Plaintiff had bleeding wounds on his knee following the incident. (*Id*. at 4, 10.)

8   Plaintiff contends that defendant Patterson opened Plaintiff's cell door as well as the cell
9   doors of two known gang member inmates and allowed them to enter Plaintiff's cell where they
10  proceeded to assault him. (*Id*. at 7.) Plaintiff claims that his version of events is corroborated by
11  the interview his cell mate gave to the Inspector General's Office Investigator Russ Herbert as
12  well as interviews given by the two assailants. (*Id*.)

13  Plaintiff's version of events is corroborated by a report of the statement he gave to a
14  responding officer, Lieutenant Stankus, contained in the Inspector General's Office's
15  investigation file for this matter. (*See* Doc. # 99 at 15, reflecting that Plaintiff told him "your
16  officer is the one that should be brought up on charges, the unit was locked down and only those
17  2 cells got popped open, luckily nothing happened but that officer opened just our doors on
18  purpose.")

19  In response to defendant Patterson's version of events, Plaintiff states that Plaintiff was in
20  cell 75 and the other two inmates were in cell 72, that the cells are approximately eighteen feet
21  apart, and as a result the other inmates could not have heard Plaintiff's intercom conversation
22  with the control bubble. (Doc. # 105 at 4.) Plaintiff also indicates that if the other inmates could
23  in fact hear Plaintiff's conversation with the bubble, they could have just shouted to Plaintiff the
24  information he was seeking. (*Id*.) Plaintiff claims that even if defendant Patterson's claims are to
25  be believed, he should not have agreed to open the door to the cells; instead, he admits he opened
26  the cell doors of the inmates when the unit was locked down prior to count, which allowed them
27  access to Plaintiff's cell where they then attacked him. (*Id*.)

28  In his opposition to Plaintiff's motion, defendant Patterson argues that Plaintiff has failed

- 7 -

1  to produce evidence which supports his assertion that defendant Patterson opened Plaintiff's cell
2  door in order to allow the two inmates to enter the cell to attack Plaintiff or that he otherwise
3  knew that doing so posed any threat of danger to Plaintiff. (Doc. # 100 at 2-3.)

4        Defendant Patterson also argues that Plaintiff did not face an objectively, sufficiently
5  serious deprivation as a result of the assault because after the incident, Plaintiff stated "nothing
6  happened" and the medical report indicates Plaintiff only had two small scrapes on his knee.
7  (Doc. # 101 at 6.) Defendant Patterson acknowledges Plaintiff's statement that as the control
8  bubble officer, he had the power to open any doors in the unit. (Doc. # 100 at 3:5-6.)  Yet, he
9  claims that this does not establish that he did in fact open the cell doors to allow the inmates in
10  order to attack Plaintiff. (*Id*. at 3.) He maintains that Plaintiff asked for the cell doors to be
11  opened so he could obtain information from the other two inmates, and defendant Patterson did
12  not know of any risk of harm to Plaintiff in opening the cell doors. (Doc. # 101 at 6-7.) He
13  argues that he had no reason to anticipate any risk of harm because Plaintiff and the other two
14  inmates had access to each other throughout the day when the cell doors were open on the tier.
15  (*Id*. at 6-7.)

16        In his reply brief in support of his motion for summary judgment, Plaintiff states that he
17  walked the tier the entire day and "did not know of any danger to himself." (Doc. # 105 at 2.) He
18  says that defendant Patterson's action of opening the cell doors gave the inmates a "green light"
19  to attack Plaintiff in his cell. (*Id*.)

20        In his opposition to defendant Patterson's motion, Plaintiff asserts that he should succeed
21  because defendant Patterson was investigated as a result of the events that occurred that day and
22  implies that he ultimately was terminated from his employment at NDOC in connection with this
23  incident. (Doc. # 106 at 4.)

24        In his reply brief in support of his motion for summary judgment, defendant Patterson
25  asserts that his leaving NDOC had nothing to do with this incident, and his personnel file does
26  not contain any reprimand, discipline or documents related to this incident (Doc. # 109 at 4; Doc.
27  # 109-1 at 2 ¶ 3.) He was employed by NDOC from June 1, 2009 through July 15, 2011, when
28  he moved out of state for personal reasons. (*Id*. ¶ 4.) He was re-employed by NDOC from

1 July 30, 2012 to February 2, 2013, when he left NDOC because he was not granted an
2 assignment location transfer he had requested. (*Id*.) He also argues that Plaintiff's version of
3 events is contradicted by his own previous statements in a recorded telephone conversation
4 where Plaintiff indicated that defendant Patterson "popped" a cell door "not knowing the
5 relationship [Plaintiff] had with [the other two inmates" and that he did not do it intentionally.
6 (Doc. # 109 at 5; Doc. # 109-2 at 2:10-25, 3:1-18.)[4]

In his sur-reply, Plaintiff argues that defendant Patterson had an opportunity to prevent the assault that occurred when he admits that he told the inmates they should wait until the next day to exchange the information, but then opened the cell doors anyway. (Doc. # 122 at 3.) Plaintiff also argues in his sur-reply that defendant Patterson's report after the incident contradicts his declaration submitted in support of his motion for summary judgment because in his report following the incident, he said that inmate Sullivan walked to Plaintiff's cell and pushed Plaintiff back inside the cell and then inmate Foster ran to enter Plaintiff's cell. (*Id*. at 4.) Plaintiff contends that the fact that defendant Patterson noted that inmate Sullivan pushed Plaintiff indicates that defendant Patterson could have taken action but did not, and that he should have done something when he saw inmate Foster run into Plaintiff's cell. (*Id*.)

**B. Legal Standard**

Under the Eighth Amendment, prison conditions should not "involve the wanton and unnecessary infliction of pain" or be "grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Although prison conditions may be, and often are, restrictive and harsh, prison officials "must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 486 U.S. 517, 526-27 (1984)).

"[P]rison officials have a duty...to protect prisoners from violence at the hands of other

---

[4] Plaintiff has filed another document asserting an objection to the use of this exhibit which the court will address separately. The court references the exhibit simply to recount defendant Patterson's argument; however, no reliance is placed on the exhibit in the court's analysis and conclusion with respect to these cross-motions for summary judgment.

- 9 -

1 prisoners." *Farmer*, 511 U.S. at 833 (citations and quotation marks omitted). "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* (internal citations omitted). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 834 (citing *Rhodes*, 452 U.S. at 347).

To establish a violation of this duty, the prisoner must establish that prison officials were deliberately indifferent to a serious threat to the inmate's safety. *Farmer*, 511 U.S. at 834; *see also Labatad v. Corr. Corp. of America*, 714 F.3d 1155, 1160 (9th Cir. 2013) (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002)). Under the deliberate indifference standard, a violation of the Eighth Amendment is only found when an objective and subjective component are met. *See Farmer*, 511 U.S. at 834; *Labatad*, 714 F.3d at 1160.

First, "the deprivation alleged must be, objectively, sufficiently serious...; a prison official's act or omission must result in the denial of 'the minimal civilized measures of life's necessities.'" *Farmer*, 511 U.S. at 834 (citations and quotations omitted). When a prisoner claims prison officials failed to take reasonable steps to protect him, the prisoner must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* (citations omitted).

Second, the inmate must satisfy the subjective element. This means that the prison official must "know of and disregard an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Thus, liability only attaches if the official knows of the risk of harm and "fail[s] to take reasonable measures to abate it." *Labatad*, 714 F.3d at 1160 (citation omitted). Prison officials may therefore avoid liability by: (1) proving they were unaware of the risk, or (2) proving they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844-45

///.

### C. Analysis

The court finds that Plaintiff has not satisfied his burden of establishing the absence of a genuine dispute of material fact so that he is entitled to summary judgment as a matter of law. Defendant Patterson, on the other hand, has met his burden of demonstrating that Plaintiff failed to establish the subjective element of his Eighth Amendment claim. Plaintiff, in turn, did not produce evidence showing that a genuine dispute of material fact exists so as to defeat summary judgment.

The parties dispute many facts in this case; however, the facts in dispute are not "material" to Plaintiff's claim. There is no dispute that defendant Patterson opened the cell doors of Plaintiff and the two inmates who ultimately attacked him on the date in question. The material issue is whether defendant Patterson knew when he did this that it would subject Plaintiff to a substantial risk of serious harm. The only evidence Plaintiff comes forward with is his statement that the cells should have been on lock down prior to the "count," and defendant Patterson was the only one who could have opened the doors. Defendant Patterson asserts that he opened the cell doors at the request of the inmates, so that they could exchange information. Even if this were not true, as Plaintiff claims, Plaintiff presents no evidence that in opening those doors defendant Patterson knew of any risk of harm that might befall Plaintiff. In fact, Plaintiff admits that he himself did not know of any risk of harm from these inmates. He concedes, as defendant Patterson points out, that these inmates all had access to one another throughout the day while the doors to the cells on the tier were open and there were no known problems. While Plaintiff refers to these inmates as known gang members in his filings, he presents no evidence to substantiate this statement. More importantly, there is no indication that their purported gang-affiliation had anything to do with their attack on Plaintiff or that defendant Patterson knew anything about their gang affiliation that would alert him to a risk of harm posed to Plaintiff.

Plaintiff places much weight on the argument that the rules and regulations precluded the practice of opening the doors in the manner defendant Patterson opened them; however, it is not the rules and regulations that govern the Eighth Amendment inquiry. Regardless of what the regulations state, there must be evidence that the defendant *knew of and disregarded* a

substantial risk of serious harm. In the absence of such knowledge, there can be no liability.

Plaintiff also seizes on to the fact that defendant Patterson's report after the incident states that one of the inmate's pushed Plaintiff into his cell while the other ran in and then the attack began. There is no indication, however, that defendant Patterson could or should have abandoned his post in the control bubble when trouble presented. Instead, the facts in the record reflect that once trouble appeared, officers on the floor were immediately notified and responded. Therefore, these statements in the report are not evidence of deliberate indifference on the part of defendant Patterson.

Finally, Plaintiff presents a purely speculative argument that defendant Patterson must be liable for the attack because he ultimately left NDOC. Plaintiff's argument is unsupported by any evidence. In fact, the uncontroverted evidence presented by defendant Patterson establishes that his leaving NDOC had nothing to do with this incident or any investigation into this incident. Plaintiff's notation that some forms in Mr. Patterson's personnel file are unsigned does not equate to evidence corroborating Plaintiff's conjecture regarding Mr. Patterson's departure from NDOC.

In sum, the court recommends that Plaintiff's motion for summary judgment should be denied and defendant Patterson's motion for summary judgment should be granted.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **DENYING** Plaintiff's motion for summary judgment (Doc. # 99) and **GRANTING** defendant Patterson's motion for summary judgment (Doc. # 101).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

///

///

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED: June 11, 2014

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE